## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| Kenneth Mays, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 07065 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| LaWanda Frazier-Banks, Wendy | ) | |
| Olsen-Foxon, Benaye Foster, Imhotep | ) | |
| Carter, and Jayme Routsaw, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

Kenneth Mays was an inmate at Stateville Correctional Center in Illinois. He filed this civil-rights lawsuit under 42 U.S.C. § 1983 against three Illinois Department of Corrections employees (LaWanda Frazier-Banks, Wendy Olsen-Foxon, and Benaye Foster), as well as two employees (Imhotep Carter and Jayme Routsaw) of the private health-care provider that provides medical services to IDOC inmates.[1] Mays alleges that the Defendants were deliberately indifferent to his medical needs in violation of the Eighth and Fourteenth Amendments, and intentionally caused him emotional distress in violation of state law.[2] R. 20, Am.

---

[1] For convenience's sake, Frazier-Banks, Olsen-Foxon, and Foster are collectively referred to as the "IDOC Defendants" (IDOC stands for Illinois Department of Corrections), and Carter and Routsaw are collectively referred to as the "Wexford Defendants" (Wexford Health Sources, Inc. is the name of the private health-care provider).

[2] The Court has subject matter jurisdiction over the federal claim based on 28 U.S.C. § 1331 and 42 U.S.C. § 1983 (Section 1983), and supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367.

Compl.[3] All of the Defendants now move for summary judgment on Mays's claims. For the reasons discussed below, the Court grants summary judgment for all of the Defendants on all of Mays's claims.

## I. Background

In deciding the summary judgment motions, the following facts are viewed in the light most favorable to Mays (because he is the non-movant), and all reasonable inferences are drawn in his favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Mays was an inmate at Stateville Correctional Center between May and December 2011. R. 160, Wexford DSOF ¶¶ 21, 81. During his time at Stateville, Mays believed that everyone at the prison was part of a conspiracy to poison him. R. 154, IDOC DSOF ¶¶ 7-8; R. 154-2, Exh. B (Mays Dep. 68:21-24).[4] Mays suffers from schizophrenia, delusions, and paranoia. IDOC DSOF

---

[3]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "IDOC DSOF" (for the IDOC Defendants' (Frazier-Banks, Olsen-Foxon, and Foster) Statement of Facts) [R. 154]; "Wexford DSOF" (for the Wexford Defendants' (Carter and Routsaw) Statement of Facts) [160]; "PSOF" (for Mays's Statement of Additional Facts) [R. 171]; "Pl.'s Resp. IDOC DSOF" (for Mays's Response to the IDOC Defendants' Statement of Facts) [R.169]; "Pl.'s Resp. Wexford DSOF" (for Mays's Response to the Wexford Defendants' Statement of Facts) [R.170]; IDOC Defs.' Resp. PSOF (for the IDOC Defendants' Response to Mays's Statement of Additional Facts) [R. 175]; Wexford Defs.' Resp. PSOF (for the Wexford Defendants' Response to Mays's Statement of Additional Facts) [R. 173]. It is worth noting that the IDOC Defendants moved to strike Mays's Rule 56.1 Response. *See* R. 174, IDOC Defs.' Reply Br. at 3-5. Because the IDOC Defendants' summary judgment motion will be granted even considering Mays's Rule 56.1 Response, *see infra*, the motion to strike is terminated as unnecessary.

[4]It is worth noting two discrepancies in the Wexford Defendants' summary judgment filings. First, the Wexford Defendants inadvertently filed the wrong deposition transcript as Exhibit A to their Rule 56.1 Statement. Exhibit A was supposed to be Mays's deposition transcript. This filing error was never corrected. Second, the Wexford Defendants did not file an Exhibit D to their Rule 56.1 Statement (Exhibit D is cited in their Rule 56.1 Statement as Mays's medical records). The IDOC Defendants, however, filed both Mays's deposition transcript (R. 160-2, Exh. B) and Mays's medical records (R. 157, Exh. C). Given

¶ 9; R. 171, PSOF ¶ 3; Mays Dep. 53:23-54:7. He also suffers from suicidal ideations. Wexford DSOF ¶ 20. Because of these ideations and repeated suicide attempts, Mays was often under suicide watch at Stateville's infirmary, where medical personnel could monitor him. IDOC DSOF ¶ 12; Wexford DSOF ¶¶ 17, 19; Mays Dep. 26:20-27:4. To help him cope with these serious mental illnesses, Mays took various psychotropic medications. Wexford DSOF ¶ 21; R. 157, Exh. C (Mays Med. Record at IDOC 56, IDOC 92-95, IDOC 105-20, IDOC 140-50, IDOC 383).[5] These medications, administered in various combinations, included Haldol, Cogentin, Depakote, Zantac, and Zoloft. *See* Wexford DSOF ¶ 21; Mays Med. Record at IDOC 92-95, IDOC 105-20, IDOC 125-35, IDOC 383.

In addition to mental illnesses, Mays suffered from physical ailments, including hypertension, a blood clot, and a hernia. Wexford DSOF ¶¶ 20-21; Mays Med. Record at IDOC 383; Mays Dep. 18:2-12. Mays took Norvasc for his hypertension. Mays Med. Record at IDOC 56, IDOC 383. When he was an inmate at Stateville, Mays complained of several other physical ailments, including chest pain, stomach pain, blood in his stool, tooth pain, and vomiting. *See, e.g.*, Mays Med. Record at IDOC 7-10 (chest pain and discolored stool), IDOC 48 (tooth ache), IDOC 205 (stomach pain), IDOC 211 (chest pain, abdominal pain, and vomiting), IDOC

---

this, the Court just cites to Exhibits B and C from the IDOC Defendants' Rule 56.1 Statement for all references to Mays's deposition transcript and his medical records

[5]The IDOC Defendants filed Mays's medical record (Exh. C to IDOC DSOF) under seal. There is a very strong presumption of public access when under-seal evidence is relied on for judicial decision-making. Accordingly, because the Court relies on portions of Mays's medical record to decide Defendants' motions for summary judgment, those portions may not remain under seal.

277 (chest pain, stomach pain, and blood in stool); Mays Dep. 62:16-63:25 (vomiting).

Each defendant played a different role in the alleged deliberate indifference. Linda Frazier-Banks was a nurse at Stateville in 2011. IDOC DSOF ¶ 2; Mays Dep. 55:22-56:3. Mays asserts that, on one occasion, Frazier-Banks ignored him after seeing him vomit. Mays Dep. 62:16-63:1.[6] Frazier-Banks "laughed at [Mays] and walked off" despite Mays's request for help. *Id.* at 62:16-63:16. Mays's medical record does not mention the incident, however, and Mays cannot recall when this incident occurred. *Id.* at 62:19-20.

Next, Wendy Olsen-Foxon was a paramedic at Stateville in 2011. IDOC DSOF ¶ 3; Mays Dep. 51:18-22. Mays alleges that a "Wendy" who worked at Stateville also ignored him after seeing him throw-up in a toilet. Mays Dep. 24:8-24. Mays, however, is unclear whether the paramedic who ignored him was in fact Wendy Olsen-Foxon, or perhaps another IDOC employee named Wendy Dybas. *Id.* at 51:9-17. Either way, Mays's medical record also does not mention this incident.

The third and final IDOC Defendant is Benaye Foster, who was an investigator in the IDOC Internal Affairs Department. IDOC DSOF ¶ 4; Mays Dep. 64:1-9. Foster never provided Mays medical care. Mays Dep. 69:13-15. Mays talked to Foster (though Mays cannot remember when) about the prison's food-poison conspiracy against Mays. *Id.* at 64:13-24. Mays asserts that Foster agreed to investigate the food poisoning for him, but never did. *Id.* at 64:20-24, 65:15-19.

---

[6]Mays also claims that Nurse Frazier-Banks lied about Mays's abnormal EKG reading to his doctor, *see* Mays Dep. 56:4-58:3, but that claim has since been dismissed. R. 137.

The first of the two Wexford Health Sources employees is Imhotep Carter. Dr. Carter was the Medical Director and a practicing physician at Stateville in 2011. Wexford DSOF ¶ 4; R. 160-2, Exh. B (Carter Decl. ¶¶ 2-3). As Medical Director, Dr. Carter oversaw all clinical care and performed various administrative duties, such as evaluating Stateville medical personnel. Wexford DSOF ¶¶ 9, 13; Carter Decl. ¶¶ 4, 8. Dr. Carter dedicated about half of his time to clinical services, which included conducting clinical rounds and holding a patient clinic for inmates. Wexford DSOF ¶ 10; Carter Decl. ¶ 5. He regularly reviewed inmate medical records and prescribed treatment for inmates. Wexford DSOF ¶ 12; Carter Decl. ¶¶ 6-7.

Dr. Carter oversaw Mays's treatment for his medical problems at Stateville. Wexford DSOF ¶¶ 4, 9, 10, 12, 36, 39, 41, 43, 56, 59, 60, 70, 72. At various times, Dr. Carter consulted with his medical staff and prescribed treatment over the phone for Mays's chest pains. *Id.* ¶¶ 38-39; Carter Decl. ¶¶ 15, 16; Mays Med. Record at IDOC 239, IDOC 241. For example, Dr. Carter prescribed Tordal for Mays after medical personnel informed Dr. Carter that Mays's EKG test results were abnormal. Wexford DSOF ¶ 70; Carter Decl. ¶ 22; Mays Med. Record at IDOC 10. Dr. Carter also reviewed Mays's medical record to identify issues requiring treatment. Wexford DSOF ¶ 59; Carter Decl. ¶ 20; Mays Med. Record at IDOC 273.

In addition to generally overseeing Mays's course of treatment, Dr. Carter also personally attended to Mays. For example, Dr. Carter evaluated Mays in September 2011 and prescribed a "GI cocktail" to treat Mays's gastritis. Wexford DSOF ¶ 56; Carter Decl. ¶ 19; Mays Med. Record at IDOC 131, 212. Mays alleges,

however, that he had "numerous emergency visits" with Dr. Carter and that Dr. Carter would ignore Mays's complaints about his medical problems. Mays Dep. at 13:20-16:14, 61:18-25.

The second Wexford Defendant is Jayme Routsaw. She is a registered nurse who has worked at Stateville since 2011. Wexford DSOF ¶ 5; R. 160-3, Exh. C (Routsaw Decl. ¶¶ 2-3). Routsaw provided nursing care for inmates in the Health Care Unit, which included diagnostic and treatment services and general supervision over patients. Wexford DSOF ¶¶ 16-17; Routsaw Decl. ¶ 4. She monitored Mays while he was on suicide watch and treated his chest pain. Wexford DSOF ¶¶ 71-72; Routsaw Decl. ¶¶ 8, 11-12; Mays Med. Record at IDOC 18, IDOC 24.

Three counts remain in Mays's Amended Complaint, but two of them are really the same.[7] Count One is a claim of deliberate indifference to serious medical needs brought under 42 U.S.C. § 1983 to enforce the Eighth Amendment (as incorporated through the Fourteenth Amendment). Am Compl. at 6-7. For this claim, Mays alleges that Frazier-Banks and Olson-Foxon refused to give him medical attention when he threw-up on two separate occasions. *Id.* at 4-5. He also alleges that Foster failed to investigate Mays's medical treatment or food poisoning after Mays informed her of these issues. *Id.* at 5. The last aspect of this claim is that Dr. Carter and Nurse Routsaw allegedly denied medical treatment for Mays's various medical conditions, including hernia pain, abnormal heartbeat, chest pain,

---

[7]Mays had alleged that the Defendants violated his right to equal protection under the Fourteenth Amendment (Count Two), *see* Am. Compl. at 7, but Count Two has since been dismissed, *see* R. 22, Order at 1.

stomach pain, and blood in his stool. *Id.* at 4-5. Count Three is identical to Count One. *Id.* at 8. The only other remaining claim, then, is Count Four, which alleges intentional infliction of emotional distress under Illinois law. *Id.* Mays seeks declaratory and injunctive relief,[8] as well as damages. *Id.* at 9. As detailed below, the motions of all of the Defendants for summary judgment must be granted.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th

---

[8]Because Mays no longer lives at Stateville, his request for injunctive relief is moot. Mays concedes this in his response brief. *See* R. 167, Pl.'s IDOC Defs. Resp. Br. at 3.

7

Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Time Limit to Serve Process

Olsen-Foxon and Foster argue that Mays did not serve summons and the complaint on them on time, as required by Federal Rule of Civil Procedure 4(m). Rule 4(m) sets out the time deadline to serve process:

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).[9] Mays filed his initial complaint in September 2012, but was not allowed to proceed *in forma pauperis* until February 2013. R. 1; R. 12, Compl. Six months later, in August 2013, the Court recruited a lawyer, acting *pro bono*, for Mays. R. 50. Mays served Olsen-Foxon and Foster in early 2015. R. 119, Olsen-Foxon Waiver of Service; R. 131, Foster Waiver of Service.

Olsen-Foxon and Foster argue that they are entitled to summary judgment because Mays took nearly two years (measured from the date that Mays was allowed to proceed *in forma pauperis*) to serve them. In response, Mays contends that the delay was reasonable because there were all sorts of uncertainties about Mays's attorney representation and even what Mays's claims were. R. 167, Pl.'s IDOC Defs. Resp. Br. at 2-3. The uncertainties included whether Mays would file an

---

[9]Effective November 1, 2015, the time limit was reduced to 90 days.

amended complaint and whether the recruited attorney would continue to represent Mays. *Id.*

When considering what to do with untimely service of process, courts "must first inquire whether a plaintiff has established good cause for failing to effect timely service. If good cause is shown, the court shall extend the time for service for an appropriate period." *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). Even absent a showing of good cause, however, "the court may, in its discretion … direct that service be effected within a specified time." *Panaras*, 94 F.3d at 340-41 ("Thus, absent a showing of good cause, a district court must still consider whether a permissive extension of time is warranted.").[10]

Rule 4(m) does not itself define "good cause." Courts in this district, however, will find good cause where the plaintiff establishes that the "delay[] … w[as] entirely outside of their control." *Jamison v. Cook Cnty., Ill.*, 2014 WL 3639111, at *4 (N.D. Ill. July 23, 2014). Thus, courts will extend the service deadline to "recruit

---

[10]Courts consider a number of factors when determining whether to permissively extend service: "(1) whether the statute of limitations would bar the plaintiff's re-filing of the complaint; (2) if the defendant has been attempting to evade service or has concealed a defect in the service made; (3) whether an extension of time would harm the defendant's ability to defend the lawsuit; (4) whether the defendant received actual notice of the lawsuit; and (5) whether the defendant was eventually actually served." *Jamison v. Cook Cnty., Ill.,* 2014 WL 3639111, at *3 (N.D. Ill. July 23, 2014); *see also* Fed. R. Civ. P. 4(m), Advisory Committee Note, 1993 Amendments. Because the Court holds that Mays had good cause for serving Olsen-Foxon and Foster outside the 120-day limit in Rule 4(m), *see infra* Section III.A. at 10-12, it is unnecessary to decide whether a permissive extension would have been granted. It is worth noting, however, that probably the Court would have granted permission. The two-year statute of limitations for Section 1983 claims in Illinois would have prevented Mays from re-filing his complaint. *See Farrell v. McDonough*, 966 F.2d 279, 282 (7th Cir. 1992) (applicable statute of limitations for Section 1983 claims in Illinois is two years). And neither Olsen-Foxon nor Foster asserts that delayed service affected her ability to defend the lawsuit. Finally, both defendants received actual notice of the lawsuit and were served with process before discovery on the merits of Mays's claims was underway.

9

counsel," and to allow "recruited counsel … an opportunity to file an amended complaint." *Manzanales v. Krishna*, 113 F. Supp. 3d 972, 977 (N.D. Ill. 2015) ("*Pro se* plaintiffs are not trained lawyers and may name incorrect or immune defendants, so service is sometimes wasteful until recruited counsel has had an opportunity to cure any pleading deficiencies."); *see also Jamison*, 2014 WL 3639111, at *2-4; *Agostin v. Am. Airlines, Inc.*, 2003 WL 21349476, at *5 (N.D. Ill. Jan. 2, 2003). For example, in *Manzanales v. Krishna*, the district court extended Rule 4(m)'s service deadline where multiple recruited counsel for the plaintiff had withdrawn from the case. 113 F. Supp. at 977; *see also Agostin*, 2003 WL 21349476, at *5 (same). The district court reasoned that there was good cause to suspend service "until counsel was recruited and had an opportunity to proceed on the merits of the case." *Manzanales*, 113 F. Supp. at 977.

Like the plaintiff in *Manzanales*, Mays had good cause for serving Olsen-Foxon and Foster outside Rule 4(m)'s 120-day deadline. Mays started out as a *pro se* plaintiff, and did not get a court-recruited lawyer until August 2013, which was six months after getting *in forma pauperis* status. In October 2013, Mays's lawyer considered filing a second amended complaint to replace the *pro se* first amended complaint, and that decision period extended for some time (and, really, throughout the litigation) as counsel tried to communicate effectively with Mays. *See* Pl.'s IDOC Defs. Resp. Br. at 2. To be sure, Mays has only had one court-recruited lawyer—unlike the plaintiff in *Manzanales*, who had a slew of lawyers withdraw from representation—but Mays's lawyer repeatedly expressed genuine concern about

10

whether he could represent Mays, in view of communication and other difficulties in the attorney-client relationship. *Id.* at 2-3. In light of these circumstances, which were not completely in Mays's control, Mays had good cause for serving Olsen-Foxon and Foster outside of the usual time limit. This basis for summary judgment is rejected.

## B. Deliberate Indifference to Serious Medical Needs

The IDOC and Wexford Defendants contend that they are entitled to summary judgment on Mays's deliberate-indifference claim[11] because the record evidence does not establish a conscious disregard of Mays's serious medical needs. According to the defense, Mays's complained-of health problems—such as his chest pain, stomach pain, and vomiting—do not amount to serious medical needs. R. 156, IDOC Defs.' Br. at 5-7; R. 159, Wexford Defs.' Br. at 5-8. The defense also argues that there is not enough evidence, even viewing the evidence in Mays's favor, to prove that Defendants were aware of the severity of Mays's problems and disregarded these problems. IDOC Defs.' Br. at 5-7; Wexford Defs.' Br. at 8-15.

Prison officials violate the Eighth Amendment when they are "deliberate[ly] indifferen[t] to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prisoners must prove two things to win a deliberate-indifference claim: first, the medical condition must be "objectively sufficiently serious." *See Farmer v.*

---

[11]The Court agrees with the IDOC Defendants that Counts One and Three are really the same claim. *See* R. 156, IDOC Defs.' Br. at 10-11. Both counts allege that the Defendants were deliberately indifferent to Mays's serious medical needs in violation of the Eighth Amendment (as incorporated through the Fourteenth Amendment). Am. Compl. at 6-8. "One count may be dismissed as duplicative of another where the parties, claims, facts and requested relief are substantially the same." *Lansing v. Carroll*, 2012 WL 4759241, at *1 (N.D. Ill. Oct. 5, 2012) (internal quotation marks omitted).

*Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). A "sufficiently serious" medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512 (7th Cir. 2005) (quotation omitted). In other words, the prison official's conduct "must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

In addition to proving a sufficiently serious medical condition, a prisoner must also prove that prison officials had a "'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). This means that prison officials must have "kn[own] of a substantial risk of harm to the inmate and disregarded the risk." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Negligence is not enough. *Estelle*, 429 U.S. at 104.

### i. Frazier-Banks and Olsen-Foxon

The crux of Mays's Eighth Amendment claim against Nurse Frazier-Banks and Paramedic Olsen-Foxon is that both defendants failed to give him any medical attention when he vomited. Mays Dep. 24:8-24, 62:16-63:16. Mays testified at his deposition that Frazier-Banks "laughed at [Mays] and walked off" despite Mays's request for help. *Id.* at 62:16-63:16. Similarly (though on a separate occasion), Olsen-Foxon "walked off" after Mays informed her that he threw-up in his cell. *Id.* at 70:16-21. But the overarching problem with Mays's reliance on these episodes is

that he does not present enough facts about them to even lay a foundation for the introduction of his testimony into evidence. He does not remember when, even roughly, either incident occurred, *id.* at 62:19-20, 70:9-10, and he does not provide any factual context to understand either the seriousness of the underlying medical condition or whether Frazier-Banks's or Olsen-Foxon's reactions showed a conscious disregard of a serious medical problem. Mays could not even confirm that it was Olsen-Foxon, and not another paramedic or nurse named "Wendy," who refused to help Mays after he vomited. *Id.* at 51:9-17. (Mays's medical records do not help pin down the timing or the underlying condition.)

Even if Mays offered enough specifics to support the foundation for these events, and even drawing all reasonable inferences in favor of Mays, the record evidence still would not support the claim. First, two isolated instances of throwing up, without more, does not rise to the level of a serious medical need. This is because "[v]omiting, in and of itself, is not an uncommon result of being mildly ill." *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010). Perhaps if there was evidence of other medical red flags that accompanied the vomiting, such as "vomiting continuously for a long period of time, having blood in one's vomit, or the like," these episodes could show a serious medical condition. *Id.* ("[A]bsent other circumstances ... [vomiting] does not amount to an objectively serious medical condition."). But Mays does not offer any evidence like that.

Second, with regard to Frazier-Banks, Mays argues that she acted with deliberate indifference because she failed to take his blood pressure in response to

13

seeing him throw-up. Mays Dep. 63:17-22. But Mays has no record evidence on which to premise an argument that a failure to take a blood-pressure reading after vomiting amounts to conscious disregard of a serious medical need. To the contrary, people who are not imprisoned very often do not take blood-pressure readings after vomiting, so not doing so for a prisoner cannot amount to deliberate indifference, at least not on the bare facts presented by Mays. Mays has failed to offer evidence that either Frazier-Banks or Olsen-Foxon were deliberately indifferent to his serious medical needs.

Even if there somehow was a genuine factual question on whether Nurse Frazier-Banks and Paramedic Olsen-Foxon were deliberately indifferent, qualified immunity would kick-in to defeat the claim.[12] The qualified-immunity doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether a right is clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quotations omitted); *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003). Courts must ask "whether the law provided [the defendant] with 'fair warning' that his conduct was unconstitutional." *Id.* at 622

---

[12]Although the IDOC Defendants alleged qualified immunity as an affirmative defense, *see* R. 141, IDOC Defs.' Answer to Compl. and Aff. Defenses at 15, they did not move for summary judgment on that ground. But it is worth discussing qualified immunity, because the defense could still assert the defense at trial (if there was going to be one) in a Rule 50 motion, and if it would be successful, then a jury should not be impaneled only to be wasted when the winning Rule 50 motion was asserted.

(quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). Here, Mays does not point to any case law that interprets the Eighth Amendment as requiring any specific medical care after an isolated instance of vomiting, where there are no other medical problems or no other reason to believe that the vomiting was repeated. At the very least, qualified immunity would defeat Mays's Eighth Amendment claim against Frazier-Banks and Olsen-Foxon.

### ii. IDOC Investigator Foster

Foster also moves for summary judgment against Mays's Eighth Amendment claim. Remember that Foster was an investigator in the IDOC Internal Affairs Department. IDOC DSOF ¶ 4; Mays Dep. 64:1-9. Mays discussed the prison's alleged food-poison conspiracy with Foster. Mays Dep. 64:17-24. Mays claims that Foster said she would investigate the conspiracy, but never did. *Id.* at 65:15-19.

A reasonable jury could not find that Foster was deliberately indifferent to Mays's medical needs. Deliberate-indifference claims must be rejected where there is no evidence of the defendant's "direct, personal involvement in any alleged denial of medical care." *Hardy v. Aguinaldo*, 2003 WL 21350070, at *9 (N.D. Ill. June 10, 2003); *see also Greeno*, 414 F.3d at 656 ("'If a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.'" (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004))). In *Greeno v. Daley*, for example, the Seventh Circuit dismissed the prisoner's deliberate-indifference claim against the prison's "corrections[-]complaint appeals examiner." 414 F.3d at 655-56. The prisoner had argued that the

examiner's "fail[ure] to investigate [the plaintiff's] complaints or remedy the medical defendants' failure to provide appropriate treatment" violated the Eighth Amendment. *Id.* at 655. The Seventh Circuit rejected this argument, holding instead that the examiner's "failure to take further action once he had referred the matter to the medical providers" did not amount to deliberate indifference. *Id.* at 565-66.

Like the corrections-complaint appeals examiner in *Greeno*, Foster was not personally involved in treating Mays's health problems. Mays admits that Foster never provided him medical care. Mays Dep. 69:13-15. Instead, Mays bases his claim against Foster entirely on the single discussion they had about the prison's alleged food-poison conspiracy.[13] *Id.* at 64:17-24. That falls far short of establishing the kind of personal involvement needed to attribute any medical-needs claim against Foster. *See Vance v. Washington*, 97 F.3d 987, 991 (7th Cir. 1996) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." (citations omitted)). Because there is no evidence that Foster had any involvement in treating, or failing to treat, Mays's medical conditions, Foster wins summary judgment on this claim.[14]

---

[13]Mays alleges in his Amended Complaint that Foster also failed to investigate his medical treatment (in addition to failing to investigate the prison's food-poison conspiracy). Am. Compl. at 5. Mays, however, did not mention this during his deposition.

[14]Again, it is worth noting that, even if a jury somehow could find that Foster was deliberately indifferent to Mays's medical needs, still Foster would be entitled to qualified immunity. Cases like *Greeno* hold that non-medical defendants (like Foster) are usually not on the hook for any alleged denial of medical care.

### iii. Dr. Carter and Nurse Routsaw

Like the IDOC Defendants, the Wexford Defendants also move for summary judgment on the Eighth Amendment claim. Dr. Carter and Nurse Routsaw argue that the medical records establish repeated, appropriate medical-care responses to Mays's medical conditions, both physical and mental. Remember that for Mays to survive summary judgment on a deliberate-indifference of claim, he must raise a genuine fact issue that Carter and Routsaw consciously disregarded a known, serious risk. Even when viewed in Mays's favor, the record evidence establishes that his health problems were adequately treated, and even if the treatment was in some ways (according to Mays) ineffective, the treatment would be at most negligence. Both Dr. Carter and Nurse Routsaw personally responded to Mays's health problems repeatedly. Throughout August 2011, Dr. Carter consulted with other medical staff about Mays's condition and several times ordered that the health-care staff monitor Mays in the Health Care Unit. Wexford DSOF ¶¶ 38-39; Carter Decl. ¶¶ 8-10, 15-16; Mays Med. Record at IDOC 239, 241. In September 2011, Dr. Carter personally examined Mays. Carter Decl. ¶¶ 19-20. This exam entailed running an EKG test and prescribing a "GI cocktail" set of medications for Mays's gastritis. *Id.*; Mays Med. Record at IDOC 131, IDOC 212, IDOC 273. Finally, in November 2011, Dr. Carter prescribed Tordal for Mays after he had an abnormal EKG test result. Carter Decl. ¶ 22; Mays Med. Record at IDOC 10.[15] (This was the only abnormal EKG test result Mays had while living at Stateville.)

---

[15]There are a few occasions where Dr. Carter did not issue any orders in response to Mays's health complaints. Dr. Carter maintains that he did not give any orders on those

Nurse Routsaw monitored Mays while he was on suicide watch in October and November 2011. Routsaw Decl. ¶¶ 8-12. When monitoring Mays, Nurse Routsaw recorded her observations and the various communications she had with other medical personnel about Mays's condition, and also noted any treatment she provided to Mays. *Id.* For example, Mays complained of chest pains to Nurse Routsaw one night while she was on duty. *Id.* ¶ 12; Mays Med. Record at IDOC 18, IDOC 24. In response, Nurse Routsaw evaluated Mays, performed an EKG, and informed Dr. Carter that Mays's EKG results were normal. Routsaw Decl. ¶ 12; Mays Med. Record at IDOC 18, IDOC 24. Again, all that the medical records reveal is that she, like Dr. Carter, was responsive to Mays's medical complaints. No reasonable jury could find otherwise.

What's more, the record evidence also establishes that other medical personnel monitored and evaluated Mays's medical conditions between August and December 2011, which Dr. Carter and Nurse Routsaw could also count on in deciding what treatment to provide to Mays. *See Plummer v. Fahim*, 2014 WL 4652116, at *5 (S.D. Ill. Sept. 18, 2014) (observing that "Plaintiff's story is further contextualized by [the] fact that not only did [the defendants] treat Plaintiff, other doctors and nursing staff did as well"). Most importantly, Mays spent nearly all of this time in the infirmary under suicide watch. IDOC DSOF ¶ 12; Wexford DSOF ¶¶ 17, 19; Mays Dep. 26:20-27:4. His medical record from this time is replete with entries where medical personnel discuss, evaluate, and prescribe treatment for,

occasions because medical personnel's evaluations of Mays's complaints indicated that treatment was not needed. *See* Carter Decl. ¶¶ 18, 23; Mays Med. Record at IDOC 194, IDOC 245. Mays offers no evidence in response to Dr. Carter's declaration on that point.

Mays's cardiovascular and gastroenterological complaints. *See, e.g.*, Mays Med. Record at IDOC 8-10, IDOC 174, IDOC 205, IDOC 211-12, IDOC 241, IDOC 245, IDOC 248. For example, the entries show that medical personnel routinely evaluated Mays and ran EKG tests in response to Mays's chest pain complaints. S*ee, e.g.*, *id.* at IDOC 10, IDOC 174, IDOC 212, IDOC 235, IDOC 239, IDOC 241. The entries also show that medical personnel continued to monitor Mays even though he had normal EKG test results and nothing else indicated that he suffered from a serious cardiological condition. *See, e.g.*, *id.* at IDOC 211, IDOC 235, IDOC 239, IDOC 241.

In the face of all of this medical care, Mays does not point to any admissible evidence to raise a fact question as to Dr. Carter and Nurse Routsaw. Mays is not able to provide the necessary foundational basics to support the claim—that is, the when, where, and what of the purported complaints that he says were entirely ignored by Dr. Carter and Nurse Routsaw. *See, e.g.*, Mays Dep. 23:13-23, 61:18-25. In his deposition, Mays could not provide any coherent factual specifics about what he said were the "numerous emergency visits" he had with Dr. Carter between August and December 2011. *Id.* at 13:20-16:14. Mays also could not remember when he told Nurse Routsaw about his chest pain, stomach pain, hernia pain, or tooth pain. *Id.* at 23:24-24:7. These serious foundational issues preclude the testimony's admissibility as evidence.[16]

---

[16]Mays admits as much in his response briefs, which acknowledge that his psychotropic medications prevented him from giving lucid and reliable deposition testimony. *See* Pl.'s IDOC Defs. Resp. Br. at 1-2; R. 168, Pl.'s Wexford Defs. Resp. Br. at 1-2. But the Court repeatedly noted that if Mays was so incompetent that he needed a guardian

Although not necessary to the decision, it is worth mentioning that Mays's medical problems are very likely side effects of the psychotropic medication that Mays needs. Remember that Mays says he complained about hernia pain, chest pain, stomach pain, tooth pain, and blood in his stool. *See* Mays Dep. at 23:13-20, 60:1-13, 61:15-19; *see also* Am. Compl. at 4-5. But Mays suffers from severe mental disorders, including schizophrenia, delusions, and paranoia, and was on several psychotropic medications to help treat these disorders during his time at Stateville. *See* IDOC DSOF ¶ 9; Wexford DSOF ¶ 21; Mays Med. Record at IDOC 56, IDOC 92-95, IDOC 105-20, IDOC 140-50, IDOC 383). These medications included Haldol, Cogentin, Depakote, Zantac, and Zoloft. *See* Mays Med. Record at IDOC 92-95, IDOC 105-20, IDOC 125-35, IDOC 383; Wexford DSOF ¶ 21. During the relevant time, Mays was also on Norvasc, a medication used to treat hypertension. Mays Med. Record at IDOC 56.

Many of Mays's complained-of ailments are known side effects of these medications.[17] For example, Haldol can cause heartburn, nausea, fast or irregular heartbeat, and difficulty breathing.[18] Depakote (Valproic Acid) can cause blood in

---

or some other assistance in this litigation, then he or his recruited counsel could file a motion for some kind of relief. None was filed, nor has Mays tried to file an after-the-deposition affidavit to clarify his asserted facts.

[17]By citing to National Institutes of Health, Mayo Clinic, and pharmaceutical manufacturers' websites, the Court is not wading into the dispute about the introduction of facts on *appeal. See Rowe v. Gibson*, 798 F.3d 622, 628 (7th Cir. 2015). At the district-court level, the losing litigant (here, Mays) can file a motion to reconsider if the losing party believes that there is evidence to rebut or to examine the cited information.

[18]*See Haloperidol*: *What side effects can this medication cause?*. NAT'L INST. OF HEALTH: MEDLINEPLUS, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682180.html (last visited Feb. 22, 2016); *Haloperidol: Side Effects*, MAYOCLINIC, http://www.mayoclinic.org/drugs-supplements/haloperidol-oral-route/side-effects/drg-20064173 (last visited Feb. 22, 2016); *Haldol*, JANSSEN PHARM., INC., 10-16,

the urine or stools, difficulty breathing, nausea, chest tightness, stomach pain, and chest pain.[19] Likewise, side effects of Norvasc (Amlodipine) include upset stomach, stomach pain, chest pain, fast or irregular heartbeat, and in rare cases, blood in the urine or stools.[20]

As noted above, courts must consider the overall context of a prisoner's course of medical treatment—for example, weighing the benefits of a medication against its side effects—when analyzing Eighth Amendment claims. In *Baines v. Washington*, for example, a doctor prescribed Haldol and Cogentin to the plaintiff for acute psychosis. 1995 WL 330634, at *5 (N.D. Ill. 1995). The district court observed that "[w]hile plaintiff did exhibit some side effects [from the medications], Dr. Prinz's medical judgment was that such side effects did not warrant discontinuation of the medications and that the greater risk to plaintiff would have been from decompensation had the medications been abruptly discontinued." *Id.*; *see also Campbell v. Lane*, 1990 WL 171598, at *4-5 (N.D. Ill. Oct. 25, 1990) (holding that plaintiff's complaint that he suffered side effects from various medications, including backaches, headaches, cramps, diarrhea, vomiting, and muscle spasms

---

http://www.janssen.com/us/sites/www_janssen_com_usa/files/products-documents/039816-151001_haldol_uspi.pdf (last visited Feb. 22, 2016).

[19]*See Valproic Acid*: *What side effects can this medication cause?*. Nat'l Inst. of Health: MedLinePlus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html (last visited Feb. 22, 2016); *Valproic Acid: Side Effects*, MayoClinic, http://www.mayoclinic.org/drugs-supplements/valproic-acid-oral-route/side-effects/drg-20072931 (last visited Feb. 22, 2016); *Depakote Medication Guide*, AbbVie, Inc., http://www.rxabbvie.com/pdf/depakote_medguide.pdf (last visited Feb. 22, 2016).

[20]*See Amlodipine: What side effects can this medication cause?*. Nat'l Inst. of Health: MedLinePlus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html (last visited Feb. 22, 2016); *Amlodipine: Side Effects*, MayoClinic, http://www.mayoclinic.org/drugs-supplements/amlodipine-oral-route/side-effects/drg-20061784 (last visited Feb. 22, 2016); *Norvasc U.S. Patient Information*, Pfizer Inc., http://labeling.pfizer.com/ShowLabeling.aspx?id=562 (last visited Feb. 22, 2016).

"does not support a claim of deliberate indifference; at most, this is a claim for negligence or malpractice"), *aff'd in part and remanded on other grounds*, 958 F.2d 374 (7th Cir. 1992).

Here, the side effects on which Mays bases his Eighth Amendment claim must be viewed in light of Mays's entire psychological and physical course of treatment. Mays not only suffered from schizophrenia and delusions, but he also had suicidal ideations and repeatedly attempted to commit suicide. IDOC DSOF ¶ 12; Wexford DSOF ¶¶ 17, 19; Mays Dep. 26:20-27:4. Mays took medications to treat these severe mental disorders, which posed a danger to his own safety. Mays also took medication to treat his hypertension, a serious physical condition. Mays Med. Record at IDOC 56. Like the healthcare providers in *Baines*, the Wexford Defendants here were not deliberately indifferent to Mays's medical needs; rather, based on their medical judgment (and the judgment of other medical care professionals), they determined that the side effects Mays experienced from his medications did not warrant discontinuing them.

The last point worth making as to the Wexford Defendants is qualified immunity. Just as with the IDOC Defendants, even if a jury could find that Dr. Carter and Nurse Routsaw violated Mays's Eighth Amendment rights, qualified immunity would bar Mays's claim. Even prison officials well versed in Eighth Amendment law would not know that maintaining a mentally-ill inmate's course of treatment despite its side effects would amount to deliberate indifference where the

officials consistently monitored and evaluated the inmate's health problems. So at the very least, qualified immunity would defeat Mays's claim.

### D. Intentional Infliction of Emotional Distress

The only other remaining claim is for intentional infliction of emotional distress, which is based on Illinois common law. To win an emotional-distress claim under Illinois law, a plaintiff must prove that: (1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). Using a well-worn, common-law formulation, Illinois courts deem conduct to be extreme and outrageous where "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Ulm v. Mem'l Med. Ctr.*, 964 N.E.2d 632, 642 (Ill. App. Ct. 2012).

Where a plaintiff brings both an Eighth Amendment and an emotional-distress claim based on the same factual premise, courts routinely dismiss the emotional-distress claim if the record evidence compelled dismissal of the Eighth Amendment claim. *See, e.g.*, *Hardy v. Hardy*, 2013 WL 5325077, at *3 (N.D. Ill. Sept. 20, 2013) ("[B]ecause Wexford was entitled to summary judgment on Hardy's deliberate indifference claim, it necessarily follows that Hardy's direct [emotional-distress] claim against Wexford fails as well."); *Harrison v. Cnty. of Cook*, 2011 WL

23

4036115, at *10 (N.D. Ill. Sept. 12, 2011) ("Harrison has failed to show that there is a genuine issue of fact regarding whether Cook County or Dunlap were deliberately indifferent to his serious medical needs. … Accordingly, Cook County and Dunlap are entitled to summary judgment on Harrison's [emotional-distress] claims against them."); *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1089 (C.D. Ill. 2010) ("Plaintiffs' failure to establish an adequate factual basis to support a finding of deliberate indifference or willful and wanton conduct on their § 1983 claim necessarily precludes them from making an adequate showing of extreme and outrageous conduct or that any individual defendant intentionally or recklessly caused severe emotional distress as a matter of law."). This is because the "'deliberate indifference' and 'willful and wanton' conduct standard is a lower bar than the 'extreme and outrageous' standard … ." *Hardy*, 2013 WL 5325077, at *3. Put another way, if the record evidence does not establish that a prison official "intentionally failed to provide adequate medical/mental health care," it cannot establish that a defendant intended to inflict severe emotional distress. *Wells*, 723 F. Supp. 2d at 1089. As applied here, because Mays's Eighth Amendment claim fails, so too does his emotional-distress claim.[21]

Just a quick final word on an alternative argument presented by the IDOC Defendants. The IDOC Defendants assert that an Illinois-law form of "sovereign

---

[21]The Wexford Defendants actually do not specify which counts are targeted in their summary judgment motion. Their brief does discuss the elements of a deliberate-indifference claim, *see* R. 159 at 4-5, so clearly the defense targets that claim. There is no explicit mention of Count Four (Mays's emotional-distress claim), but the factual premise of that claim is the same as what Mays offers on the deliberate-indifference claims. Subjective intent (rather than mere negligence) is needed to prove both types of claims, so the Court treats the Wexford Defendants' motion as applying to both claims.

immunity" defeats the emotional-distress claim because "[Mays's] allegations against Defendants … arise entirely out of their employment with the State." IDOC Defs.' Br. at 9. To be sure, sovereign immunity can operate to shield a state employee if "judgment for the plaintiff could operate to control the actions of the State or subject it to liability." *Loman v. Freeman*, 890 N.E.2d 446, 453 (Ill. 2008) (quotation and citation omitted). But there is a long-standing "officer suit" exception to sovereign immunity. This exception provides that "when an officer of the State commits an unconstitutional act or violates a statute, the suit is not against the State, because the State is presumed not to violate its own constitution or enactments." *Turpin v. Koropchak*, 567 F.3d 880, 884 (7th Cir. 2009); *see also Nichol v. Stass*, 735 N.E.2d 582, 586 (Ill. 2000) ("Sovereign immunity affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law … ."). Here, Mays's emotional-distress claim, if successful, would also amount to a violation of the Eighth Amendment, so the IDOC Defendants would not have enjoyed the protection of sovereign immunity. In any event, as discussed above, the emotional-distress claim does fail, because no reasonable jury could find for Mays on the Eighth Amendment claim.

## IV. Conclusion

For the reasons discussed, the motions for summary judgment, R. 155, 158, are granted in favor of both sets of defendants. The status hearing of April 21, 2016 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 21, 2016